Nelly BUZIASHVILI, Individually and
as Widow of Michael Buziashvili,
Plaintiff–Appellee,

v.

James INMAN and Veanna Inman,
Defendants–Appellants.

No. 96–5209.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 3, 1996.

Decided Feb. 11, 1997.

Jerrold L. Becker (argued and briefed), Lockridge, Becker & Valone, Knoxville, TN, for Plaintiff–Appellee.

George H. Buxton, III (argued and briefed), Buxton & Wilkinson, Oak Ridge, TN, for Defendants–Appellants.

Before: MERRITT, KENNEDY, and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

In this wrongful death action, defendants appeal from a jury verdict awarding $500,000 in compensatory damages and $300,000 in punitive damages. Joint and several liability was imposed upon the husband and wife defendants.

On appeal, defendants claim error in a number of particulars that we will discuss. Upon examining the entire trial record, we conclude that the judgment against James Inman should be affirmed but the judgment entered against his wife, Veanna, should be vacated.

## I.

The decedent, Michael Buziashvili, immigrated with his family to the United States from Russia in 1973. The Buziashvilis settled in a community primarily composed of Georgian immigrants in New York City. Michael found work as a cab driver and continued to drive a cab six to seven days a week until 1988 when he invested his savings in a jewelry business in partnership with his nephew, Albert Tizov. Together they opened a small jewelry store in a mall in Queens, New York. For the purpose of buying jewelry at wholesale, Buziashvili and Tizov often travelled to jewelry trade shows. It was at such a show in Boston, Massachusetts, that they first met defendant James Inman, who was a wholesale jewelry merchant. Inman sold jewelry primarily at trade shows, but he occasionally sold from his home in Tennessee. Inman's wife, defendant Veanna Inman, was also involved in operating the wholesale jewelry business.

It appears from the record that purchases were made from the Inmans on four occasions, the first being at the Boston trade show and subsequently at a trade show in Cleveland. Buziashvili and Tizov also travelled to the Inmans' house in Tennessee on two occasions to buy jewelry. Typically, $20,000 to $30,000 worth of jewelry was purchased. All of the jewelry purchased was represented to be 14K gold, and the price paid was determined by the weight of the jewelry.

At some point in time, a disagreement arose between Buziashvili and Tizov and the Inmans. Buziashvili and Tizov claimed the jewelry that the Inmans were selling them was not 14K gold, but was only 11K gold. They further claimed that they had a number of dissatisfied customers to whom they had to make refunds and that they ended up scrapping about one-third of the jewelry purchased from the Inmans. It is the Inmans' version of the dispute that the jewelry sold was as represented, and that Buziashvili and Tizov had been stealing jewelry from them during the course of the jewelry display that preceded the purchases. Notwithstanding the claims and suspicions of the parties, they continued to do business with one another.

Tizov testified at trial they had repeatedly discussed with the Inmans the problem with the jewelry purchased, and each time the Inmans promised to make it up to them by giving them some jewelry free the next time or giving them a discount on the jewelry they purchased. This never occurred, however.

On July 3, 1989, Tizov and Buziashvili flew from New York to Tennessee to purchase more gold from the Inmans and allegedly to resolve the dispute relative to the jewelry previously purchased. Because large quantities of valuable jewelry were kept by the Inmans in their house, the house was surrounded by a chain-link fence with a gate that could only be opened by remote control from inside. In addition, the Inmans had one or more watchdogs and kept a number of firearms on the premises. On or about July 3, 1989, the Inmans were also in the process of installing a closed-circuit television system in their house that would monitor the area of the basement they used for the display and sale of jewelry on those relatively rare occasions when purchasers came directly to the house.

In connection with the July 3, 1989 trip, it is clear that Tizov, at least, by his own admission, did not intend to rely on the goodheartedness of the Inmans to make them whole for the alleged short-weighting that had previously occurred. Tizov came equipped with special pockets built into his pants in which he intended to hide jewelry that he was going to steal from the Inmans.

Whether the Inmans had similar intentions to extract their own pound of flesh from Tizov and Buziashvili is not clear, except that two other men were hidden in the Inmans' house when Buziashvili and Tizov arrived. It is not clear from the record whether these men, who were hidden upstairs, were able to observe what went on in the basement sales area by way of a television monitor or whether they were able to position themselves in some manner to observe that area.

What occurred next is the crux of the factual dispute in this litigation. After apparently exchanging pleasantries with the Inmans, Buziashvili began discussing with James Inman either the purchase of more jewelry or what Inman was going to do, if anything, to make good for past shortages. Tizov, in the meantime, asked Mrs. Inman to go upstairs and get him a glass of water, and while she was gone, he began stuffing jewelry in the hidden pockets of his pants. At this point in time, the two men from upstairs, one of them armed with a shotgun, descended upon Buziashvili and Tizov. It is the Inmans' contention that mutual combat then followed among the five men present and that Buziashvili began choking James Inman. Inman claims that to ward off Buziashvili, he hit him in the head with a handgun that had been on the table with the jewelry. Tizov testified that Inman hit Buziashvili in the head several times with the gun. Inman further claims that he and Buziashvili struggled for control of the weapon, and in the course of the struggle the weapon discharged and the bullet entered Buziashvili's skull and killed him. Inman also contends that Tizov, upon being caught stealing jewelry, pleaded with Inman not to call the police and promised that he could raise $100,000 which he

would give to the Inmans if they would let him go.

It is Tizov's version that the Inmans demanded $100,000 from Tizov under the threat of serious harm coming to him. There is no doubt that at some point Tizov's hands and feet were bound with tape. Inman contends that tying up Tizov, as well as all other actions taken by him and the other two men present, were merely to hold Buziashvili and Tizov on the premises until the police could arrive and arrest them for the jewelry theft.

The police, although ultimately summoned, were not immediately called. Inman first placed one or more calls to his attorney and also called a neighbor. Someone eventually called the police, but it was 75 minutes after the shooting occurred before the police arrived. What happened after the police arrived and in the ensuing days and weeks is only very sketchily set forth in the record.[1] We are able to deduce, however, that Tizov was allowed to return to New York with no criminal charges placed against him. Ross Haines, a criminal investigator for the Tennessee Bureau of Investigations, travelled to New York and took a statement from Tizov in which he admitted stealing from Inman on the day that Buziashvili was killed as well as on an earlier occasion.[2] The balance of what Tizov told Haines was exculpatory as to him and Buziashvili and inculpatory as to James Inman and the other two men who were present on that date. Although no details are set forth, it was a trial stipulation that "James Inman, was convicted on August 1, 1990, of voluntary manslaughter, aggravated assault, and robbery and was incarcerated for one year before being released on probation."[3] Although there is no indication of

1. Although this case involved a somewhat complex and very much disputed factual scenario, the trial was remarkably short. Both sides inexplicably failed to call witnesses who would seem to have had very relevant testimony to offer, and both counsel appeared wary of "asking that fatal extra question" so that the testimony from the witnesses who did testify leaves many questions unanswered.

2. Whether it is convenient or real, Tizov at times appears to have a language barrier problem. He consistently explains any inconsistencies in statements or testimony that he gives by stating that

he did not understand the earlier question or that the person taking his statement did not understand his response. In that vein, Tizov testified at trial that the only time that he ever stole from the Inmans was at the July 3 meeting.

3. The other two men who were present at the time that Buziashvili was killed were Edward Reynolds and Everett Stewart. We are not told whether Reynolds or Stewart were ever prosecuted, although we do know that they were originally defendants in this wrongful death action, but were voluntarily dismissed on December 6, 1994. Also, neither Reynolds nor Stewart testi-

what evidence was offered in the criminal trial of James Inman, we do know that police found almost $30,000 hidden in Inman's attic and that some of the bills had blood on them. Tizov indicated in his trial testimony that he and Buziashvili had brought $30,000 with them for the purchase of jewelry. Forensic evidence also established that neither Tizov nor Buziashvili's prints were found on any of the firearms found in Inman's house, and that a forensic pathologist testified that Buziashvili suffered at least twelve blows to the head by a blunt instrument, which may well have been sufficient to have caused death even if he had not been shot. The pathologist further testified that it was beyond dispute that the firearm was being held against the head of Buziashvili when it discharged.

## II.

On appeal, the Inmans claim there were eleven trial errors, any one of which would require reversal. Since we have indicated that we believe the claims of errors relative to the judgment against Veanna Inman are well taken, we first address those claims.

Notwithstanding that plaintiff knew the jury in the wrongful death case would be made aware that Inman had already been convicted of assaulting, killing and robbing Buziashvili, a very broad approach was taken insofar as the complaint filed in this case is concerned. Several theories of recovery were alleged. Among those that would be relevant to defendant Veanna Inman are civil conspiracy, criminal conspiracy, intentional infliction of emotional distress, outrageous conduct, negligence, gross negligence, theft, conversion and damage to property. Apparently, included within the parameters of the negligence count is the claim that Veanna Inman, as co-owner of the property on which the death of Buziashvili occurred, had a duty to summon aid which she breached.

■ Taking the record in the light most favorable to the plaintiff, the most that is shown as to Veanna Inman is that she was

active in the family jewelry business and that she, along with the two other men, was present in the house on the day that Buziashvili's death occurred. Her testimony stands undisputed, however, that she was not present during the altercation and shooting, and that although the sounds of the scuffle caused her to return to the head of the basement stairs, she in no way was a participant in whatever assault or shooting occurred. There is also no testimony from which a reasonable jury could conclude that there was a preconceived plan to do harm to either Buziashvili or Tizov. The most that the jury could conclude was that the Inmans were suspicious that Buziashvili and Tizov had been stealing from them and that they were prepared to catch them in the act if they could. It is a quantum leap from that, however, to hold Veanna Inman responsible for the subsequent altercation and death of Buziashvili.

■ Similarly, there is no record to support a finding that, even assuming Veanna Inman had a duty to summon aid for Buziashvili, she knew whether he was alive or dead after the shooting. Even if the jury did conclude that not knowing she should have summoned aid, there is no testimony from which the jury could have concluded that Buziashvili was not already dead by the time she returned to the basement. Our finding as to Veanna Inman on the issue of sufficiency of the evidence makes it unnecessary to consider defendants' other claims as they relate to Veanna, including the contention that it was inappropriate to enter a joint and several judgment.[4]

## III.

We now turn our attention to those claims of error that are now only relevant to James Inman.

## A. The Introduction into Evidence of a Criminal Conviction of James Inman that Occurred Twenty Years Earlier

■ During plaintiff's case, James Inman was called as an adverse witness. Near the

---

fied at the wrongful death trial, and no explanation was offered by either side for their absence.

4. This holding as to Veanna Inman may well have little effect as a practical matter. There

was no testimony at trial offered to show that Veanna Inman had any independent assets, estate, income, or property from which a judgment could be satisfied.

conclusion of his direct examination by plaintiff's counsel, the following colloquy occurred:

Q Have you ever been convicted before of any felony, Mr. Inman?

A In my entire life?

MR. BUXTON: Your Honor, there has to be a time frame.

A (Continuing) Twenty years or—

THE COURT: Not in a civil case. Answer the question.

THE WITNESS: I'm not sure that I understand it totally, Your Honor.

THE COURT: Have you ever been convicted of a felony?

THE WITNESS: Over 20 years ago.

BY MR. BECKER (Continued):

Q For what?

A If I'm not mistaken, sir, I think the original charge was a grand larceny or something like that.

Q Is that the only thing you've been convicted of?

A The only felon I think I've been convicted of outside of probably what the court call manslaughter in the case of Mr. Buzi.

In defendants' brief on appeal, defendants claim that the evidence of this conviction was admitted "[o]ver the timely objection of the Defendant that the question was improper, overly broad, and inquiring into matters that were time-barred...." As can be seen from the portion of the record quoted above, the only objection that was made referred to the necessity for a "time frame." We therefore limit our consideration of this issue to the objection actually made at trial.

Rule 609 of the Federal Rules of Evidence provides, in pertinent part:

(a) **General rule.** For the purpose of attacking the credibility of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

(b) **Time limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

When defense counsel made his objection and the trial judge responded "not in a civil case," it is unclear what was intended. Although historically there was a split of authority among the circuits as to whether Rule 609 applied in a civil case, that issue has been resolved by the Supreme Court in favor of the view that Rule 609 does apply in civil trials. *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (civil witness may be impeached by evidence of a prior felony conviction regardless of ensuant unfair prejudice to the witness). Thus, if the judge meant the rule did not apply in civil cases, he was clearly in error. However, if he meant the 10–year limitation was not applicable in civil cases, this is an issue that has never been considered by the Supreme Court or this circuit. We find it unnecessary to resolve that issue at this time, however, since we find that if the court was in error, any error was harmless as a matter of law. The jury was made aware the conviction was over 20–years old, and there was no elaboration on Inman's answer; nor was the conviction referenced in plaintiff's closing argument.

More importantly, however, the jury knew Inman already had been convicted of assaulting, robbing, and killing Buziashvili so that, possessed of that knowledge, a twenty-year-old larceny conviction would certainly become insignificant in their considerations.

**B. Did the Court Err in Failing to Instruct the Jury that a Tennessee Statute Bars a Civil Cause of Action for Wrongful Death if the Decedent was in the Act of Perpetrating a Felony When he was Killed?**

Section 29–34–201 provides in pertinent part:

**Injuries suffered in committing or attempting to commit felony on property of another—Recovery barred.**—Any person who is injured while committing a felony or attempting to commit a felony on the real property of another is barred from recovery of actual or punitive damages resulting from injuries, either accidentally or intentionally inflicted by the owner, lawful occupier or tenant of such property, which the person receives while committing or attempting to commit a felony.

Tenn.Code Ann. § 29–34–201 (Supp.1996).

[4] The defendants asked that the jury instructions include a reference to the above-quoted Tennessee statute, but the district court refused to give such an instruction. We review the district court's refusal to give this instruction under an abuse of discretion standard. *See, e.g., United States v. Jinadu,* 98 F.3d 239, 246 (6th Cir.1996). Although we would not have found error had the court given this instruction, we cannot conclude that it was a clear error of judgment on the trial judge's part to refuse to give this instruction. If Tizov had been killed rather than Buziashvili and this were a wrongful death action brought on his behalf, the court would have been required to give this instruction, since Tizov came to the Inmans prepared to commit a felony and did in fact steal jewelry while he was on the premises. Conversely, however, there is no testimony implicating Buziashvili in the theft other than the fact that he was in business with Tizov. Inman admitted in his testimony that Buziashvili was in his sight the entire time he was present and that he never saw him do anything wrong. Also, Buziashvili was not armed and, unlike Tizov, was not wearing pants designed to aid in the theft of Inman's jewelry. Since there was insufficient testimony from which the jury could conclude that Buziashvili was committing or attempting to commit a felony, the trial judge was justified in refusing to give the requested instruction.[5] *Bucyrus–Erie Co. v. General Prods. Corp.,* 643 F.2d 413, 420 (6th Cir. 1981).

**C. Did the Court Err in Allowing the Plaintiff to Reopen her Case After Resting for the Purpose of Introducing Into Evidence the Decedent's W–2 Income Tax Forms Covering a Period of Three Years?**

At the conclusion of plaintiff's proofs, defendants moved for a directed verdict. As part of their motion, they argued as follows:

*MR. BUXTON:* Additionally, I would move to dismiss, because there's been no showing of any pecuniary value of the deceased's life which is the sole basis for a wrongful death action in Tennessee.

*THE COURT:* Well, counsel, for the plaintiff, going to have to a problem in proving that. Only thing we've got is a 52–year–old man who worked 70 hours a week, and there's no testimony as to the value of his earnings.

The only thing that's in the record is the fact that they did 30 to something—I forget the figure—some $30,000 weekly, and the jury—I don't know what the mark-up in the jewelry business is. I don't know what the mark-up is.

*MR. BECKER:* Your Honor, we have the W–2, and we forgot to put that in, frankly.

*THE COURT:* Yeah.

---

5. In her appellate brief, plaintiff argues that even if the judge's failure to give this instruction was error, it was harmless error because the "jury found Michael Buziashvili to have not been negli-gent...." We are unable to understand how this finding by the jury would have had any bearing on whether the court committed error in failing to give the requested instruction.

*MR. BECKER:* I don't think it was relevant, though, because it was when he was a taxicab driver, number one; number two, I think the 30 and $50,000 a week shows the fact that they were able to purchase the gold for 20 to 30,000.

*THE COURT:* Well, you don't have the facts in the record.

*MR. BECKER:* Well, we had no way, the time he was a jeweler, other than they were making investments, reinvesting, buying more merchandise. I believe that we are entitled to go to the jury on the issues involved in the pain, suffering that he sustained, the beating.

*THE COURT:* Right. You're entitled to that.

*MR. BECKER:* On those matters. But you're right, we cannot prove what his pecuniary value was at the time of his death, because he had changed his profession and was in a new business that was quite uncertain.

*THE COURT:* Well, if you want to get the W–2's in, I don't care.

*MR. BECKER:* Well, I'd like to put the W–2's in, if the court would permit me to do that.

*THE COURT:* Because, very simply, it is a very important part of your proof, and you have to rely on the best evidence you've got.

*MR. BECKER:* That's all I have. I'll put that in.

*MR. BUXTON:* Is the court going to allow them to reopen the case, then?

*THE COURT:* I'm going to allow them to put the W–2's in.

Subsequent to this ruling, Nelly Buziashvili was recalled and Michael Buziashvili's W–2 forms for 1984, 1985, and 1987 were introduced into evidence. The W–2 forms indicated income for 1984 of $27,477.47, for 1985 income of $33,127 and for 1987 earnings of $50,048.25.

We review a decision by a trial court to allow a party who rested to reopen her case under an abuse of discretion standard. *Calage v. University of Tennessee,* 544 F.2d 297, 302 (6th Cir.1976). We find no abuse of discretion here. The reopening occurred immediately after the plaintiff had rested and before the defendants started putting in their case. Furthermore, the nature of the evidence put in was documentary, and defendants did not have to deal with unanticipated testimony from an unanticipated witness. Defendants could have, and should have, reasonably presumed that the plaintiff would be offering evidence as to the decedent's earning capacity and should have been prepared to confront or contradict that evidence, if possible.

■ Additionally, in Tennessee, there are two types of damages that are recoverable in a wrongful death action: (1) Damages for mental and physical suffering, loss of time, and necessary expenses resulting to the deceased from the personal injuries; and (2) Incidental damages incurred by the next-of-kin from the death of the deceased, including damages for the pecuniary value of the life of the deceased, based upon consideration of (a) the life expectancy of the deceased; (b) his age, condition of health, and strength; (c) his capacity for earning money through any skill, and any art, trade or profession; and (d) his personal habits as to sobriety and industry. *See Davidson Benedict Co. v. Severson,* 109 Tenn. 572, 72 S.W. 967, 977 (1903). At best, defendants would have been entitled to only a partial directed verdict on the issue of plaintiff's earning capacity while he worked as a taxi driver. This, of course, was not his most recent employment. Plaintiff still would have been entitled to have the issue of damages for mental and physical suffering submitted to the jury. Additionally, in terms of the pecuniary value of the life of the deceased, the jury was furnished with information as to his life expectancy; his age; condition of health and strength; his personal habits as to sobriety and industry; and at least general information as to his capacity for earning money as it related to the jewelry business.

**D. Did the Court Err in Allowing Photocopies of Decedent's W–2 Forms to be Introduced into Evidence?**

We review this claim of error under an abuse of discretion standard. *Clarksville–*

*Montgomery County Sch. Sys. v. United States Gypsum Co.*, 925 F.2d 993, 999 (6th Cir.1991).

■ After being allowed to reopen her case, plaintiff attempted, through her testimony, to introduce decedent's W–2 forms. The only foundation laid was her possession of the W–2 forms prior to sending them to her attorney. This elicited an objection that, although less than clear, was probably intended to raise the issue of the proposed exhibits being photocopies, question their authenticity, and also object to the proposed exhibits as hearsay. The court's response to this objection was to ask plaintiff's counsel to lay a foundation, and after counsel struggled to do so, the court ultimately concluded that defense counsel's objection was overruled without any further elaboration. Although the counsel's arguments on this issue and the court's ruling are something less than a model of clarity, we nonetheless conclude that if any error occurred, it was harmless as a matter of law. Photocopies are allowed into evidence as if they were originals. FED. R.EVID. 1003. Furthermore, the W–2 forms were sufficiently authenticated in that they appeared to be what they purported to be, and defense counsel was not able to make any serious challenge to their authenticity. *See* FED.R.EVID. 901(b)(1). It was undisputed that plaintiff had worked as a taxi driver for the years in question, that he was paid, that he would have gotten a W–2 form at the end of the year, and that the amounts in question did not seem inconsistent in any way with what a New York taxi driver, working six to seven days a week, would be expected to earn.

Plaintiff's counsel never really responded to the hearsay portion of defense counsel's objection, and the court did not indicate in any way in its ruling why the hearsay objection was not well taken. We review this hearsay issue de novo and conclude the exhibit was hearsay. *Hancock v. Dodson,* 958 F.2d 1367, 1371 (6th Cir.1992). We are unable to construct an argument on plaintiff's behalf as to why this exhibit was not hearsay. As we have indicated earlier, however, any error involved in its admission was harmless.

**E. Did the Court Err in Not Including on the Jury Verdict Form a Question Relative to Whether or not the Defendants Were Confronted with a Sudden Emergency?**

■ Just after the jury was brought back into the courtroom to be given the instructions by the trial judge, the following colloquy occurred between the judge and defense counsel:

> *THE COURT:* The verdict form all right, Mr. Buxton?
>
> *MR. BUXTON:* If I can address the court in the presence of the jury, I don't see any discussion in there concerning whether or not there is a sudden emergency. I just glanced at it. I don't know if I missed it.
>
> (PAUSE)
>
> *THE COURT:* Look at number seven.
>
> *MR. BUXTON:* Yes, I understand that.
>
> *THE COURT:* That subsumes that specific—
>
> *MR. BUXTON:* I guess I would suggest to the court that what we do is to add another question after seven. There would be a duplication as phrased, number five, except substituting the words "sudden emergency" for "self-defense."
>
> *THE COURT:* Oh, that, that doesn't work.
>
> *MR. BUXTON:* All right.

The court did instruct on defendants' theory of sudden emergency. The following instruction was given to the jury:

> The defendants have raised two defenses to the plaintiff's claims. First, the defendants claim that they were placed in a sudden emergency.
>
> When a person, by a sudden emergency, which is not due to his own negligence, is placed in a position of immediate danger or injury to his person or property, or injury to the person or property of others, he is not held to the same accuracy of judgment as is required under ordinary non-emergency circumstances, and if he pursues a course of action to avoid an accident such as an ordinarily prudent person placed in a similar position might choose, he is not

guilty of negligence even though he did not adopt the wisest choice.

One who has by his own negligence created the perilous situation may not excuse his conduct on the basis of reaction to a sudden emergency.

The verdict form given to the jury did contain a specific interrogatory relating to defendant's theory of self-defense:

5. Was the killing of Michael Buziashvili justified by self defense?

_____ YES

_____ NO

Since the court saw fit to incorporate one of defendants' two theories of defense in a special interrogatory, it is not at all clear why the trial judge chose not to also include an interrogatory incorporating defendants' sudden emergency theory. The court's response of "that doesn't work" is unexplained and, at least to us, not understandable. Whatever error was involved, however, in not submitting an interrogatory was rendered harmless by the fact that the jury in interrogatory no. 1, found that James Inman intentionally used force against the person of Michael Buziashvili, thereby causing his death. Since the sudden emergency theory of defense related only to plaintiff's negligence claim, any error in the submission of interrogatories to the jury relative to the negligence claim would have become significant only if the jury had found that James Inman had not intentionally caused the death of Michael Buziashvili.

**F. Did the Court Err in Failing to Grant a Judgment Notwithstanding the Verdict Based upon an Inconsistency in the Jury's Verdict?**

■ The jury verdict form was divided into two sections—intentional acts and negligent acts. Under the section dealing with intentional acts, the jury concluded that James Inman intentionally used force against Michael Buziashvili and caused his death. The jury also concluded the Inmans intentionally inflicted severe emotional distress on Michael Buziashvili. In the negligent acts portion of the jury form the jury found that negligence on the part of the Inmans proximately caused the death of Michael Buziashvili. We find no inconsistency in the

verdict because of the manner in which the jury was instructed. Relative to negligence, the jury was instructed as follows:

Next, I am going to read three Tennessee statutes to you. If you find that a party to this action violated any of these three statutes, you will find that the violation was negligence. Such a finding of negligence, however, does not require a finding against the party violating the statute unless you also find that the violation was the proximate cause of the injury or damage to another or to himself.

Tennessee Code 39–13–211, voluntary manslaughter, is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable man to act in an irrational manner.

A person commits aggravated assault who: One, T.C.A. 39–13–102. A person commits aggravated assault who, one, intentionally or knowingly commits an assault as defined in section 39–13–101, and: (A), causes serious bodily injury to another; or (B), uses or displays a deadly weapon; or, two, recklessly commits an assault as defined in section 39–13–101(a)(1), and: (A), causes serious bodily injury to another; or (B), uses or displays a deadly weapon.

Section 39–13–401, robbery. A robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear.

Although we are puzzled by the giving of this instruction, the parties do not raise this as an issue. The jury could have found that James Inman intentionally inflicted harm on Michael Buziashvili and that in the course of doing so he violated the Tennessee statute relative to voluntary manslaughter, thus, pursuant to the court's instruction, committing an act of negligence. Given our holding that the judgment as to Veanna Inman should be reversed, we need not discuss this issue of inconsistent verdicts as it relates to her.

**G. Did the Court Err in its Handling of the Punitive Damage Issue?**

■ Defendants divide their argument relative to punitive damages into two issues.

They first argue that, since the damage portion of the trial was bifurcated, it was error for the court to allow testimony relative to the sale of their real estate and the payment of attorney fees prior to that portion of the case dealing with punitive damages. Although defendants listed this as an issue, they make no argument in their brief in support of this contention. Therefore, we consider the argument waived. Even if it were not waived, the testimony relative to the sale of real estate, if anything, was helpful to the defendants in that it tended to show the defendants were impecunious. We also would find that the testimony as it related to the Inmans' payment of attorney fees of the other two defendants in the criminal case related to the issue of liability in this wrongful death action.

Defendants' second argument is that the punitive damage award was not based on a proper foundation and was speculative. We reject this contention. Although the plaintiff did not set forth in detail facts and figures relating to defendants' financial condition, neither did the defendants avail themselves of an opportunity to do so. The jury did learn something about the real estate holdings of the defendants, and they also had some insight into their business dealings based upon the nature of the transactions that took place between the Inmans and Buziashvili. They also knew that the defendants worked full-time in the wholesale jewelry business and they regularly travelled to trade shows to sell their wares.

Additionally, in a case of this nature, a large ingredient in the punitive damage award is determined by how the jury perceives the maliciousness of a defendant's conduct. Here, there was ample evidence from which the jury could have concluded that an award of $300,000 was appropriate. Defendants also argue that under Tennessee law the trial judge was required to make findings of facts and conclusions of law approving the punitive damage award. Assuming, arguen-

do, that this is a Tennessee requirement, we find there was no error in not following this procedure here, since we view this as a matter of procedure, and in a diversity action a federal court is not bound by state procedural rules.[6]

## H. Was the Jury Verdict Against the Weight of the Evidence and Grounded in Passion and Caprice?

We need spend little time on this issue since we evaluate this contention under a view of the facts most favorable to the plaintiff. The jury could have concluded, based upon the evidence in this case, that the defendant James Inman set a trap for Buziashvili and Tizov, and he had two male accomplices hiding on the premises to aid him in springing the trap. The jury also could have found that Buziashvili was brutally beaten, far beyond that which would have been necessary to hold him until the police arrived. They also could have concluded that Buziashvili was intentionally murdered. Under this set of facts, both the compensatory damage award and the punitive damage award would be well within the range that could have been returned by a reasonable jury.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** to the district court for entry of an order of dismissal as to Veanna Inman.

---

**6.** We have found no cases indicating whether this is a procedural or substantive requirement, and concede this is a close question. We note, however, that although the trial judge did not, in a proceeding denominated as such, make any findings relative to the punitive damage award, in rejecting the defendants' post-trial motions he did, by implication at least, find the award to be appropriate. Additionally, the defendants' motion to alter judgment did not raise this issue.