No. 04-1116

File Name: 05a0830n.06

Filed: October 7, 2005

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LESLIE TROUT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ELECTRONIC DATA SYSTEMS CORP., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | |

Before: **NELSON** and **MOORE**, Circuit Judges, and **RESTANI**,[*] Chief International Trade Court Judge.

**DAVID A. NELSON**, Circuit Judge. Asserting violations of the Americans with Disabilities Act and parallel state legislation, the plaintiff, who suffers from a rare neurological disorder, sued her employer on statutory claims that include failure to accommodate her limitations and retaliation for requesting the accommodation. She also asserted that the employer committed a breach of contract by denying claims for short-term disability benefits. The district court entered summary judgement for the employer, and the plaintiff has appealed.

---

[*]The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

Upon de novo review we conclude that summary judgment was properly granted on the statutory claims. As to the claim for wrongful denial of short-term disability benefits, we conclude that the record discloses genuine issues of material fact with respect to part, but not all, of the period for which benefits were sought. The challenged judgment will thus be affirmed in part and reversed in part, and the case will be remanded for further proceedings on the short term disability claim only.

I

The plaintiff, Leslie Trout, was born in 1952. She has been afflicted from birth with a brain-skin disorder known as Sturge-Weber syndrome. This condition is typically characterized by (1) a facial birthmark of the "port wine stain" variety; (2) epilepsy and other neurological complications resulting from vascular malformation in the lining of the brain; and (3) glaucoma. It has been reported that 62 percent of adults with Sturge-Weber syndrome suffer from headaches. In addition, some 50 percent of those who have normal intelligence experience emotional problems, primarily depression. See *University of New Mexico Health Sciences Center,* Your Healthcare Primer For Long Term Care: Sturge-Weber Syndrome, http://unmcoc.org/manual/sturge-weber/index.htm.

Ms. Trout is subject to petit mal epileptic seizures, but for many years the problem has been successfully controlled with medication. She also has a port wine stain and has periodically undergone surgery to retard its growth. She has suffered all her life with what

she describes as migraine headaches, and at age 21 she lost the sight of one eye to glaucoma.

For two years in the early 1980s Ms. Trout worked at a Michigan General Motors facility as a Kelly Girl. She was employed directly by General Motors for a few months in 1984, and effective January 1, 1985, she became an employee of defendant Electronic Data Systems, which was then a GM subsidiary. She has been an EDS employee ever since.

At the beginning of the current decade Ms. Trout worked in an "asset inventory" position at a technical center in Flint, Michigan, the town where she lives. In February of 2001 her pay was increased from $1362 per pay period to $1500, or $36,000 per year.

The asset management team was consolidated in another city the following August. Ms. Trout switched jobs at that time, remaining in Flint in a "request owner," or "RO," capacity. People with RO jobs work in a segment of the company called the "service request management group" — a group that Ms. Trout had been hoping to join. Her pay did not change with the job switch, but the RO position was a more highly skilled job than the one she held before.

New ROs learn the job through a combination of course work and on-the-job training. It usually takes an RO the better part of a year to become fully proficient in all the tasks associated with the position.

When Ms. Trout became an RO she was placed under the supervision of a woman named Marcia Lavery. The former supervisor, Monica Ritter, stayed with the asset management group when that unit was relocated.

Ms. Trout's start date as an RO, according to her employment records, was August 13, 2001. Ms. Trout spent the following week cleaning up work from her old job. She then began an extended period of medical leave for surgery on the port wine stain. (At her deposition she likened the birthmark to a tumor and testified that she underwent surgery periodically to arrest its growth.) EDS paid Ms. Trout short-term disability benefits throughout this medical leave, which lasted from August 20 through October 14, 2001.

In mid-December, about two months after she actually began doing RO work, Ms. Trout approached her supervisor, Marcia Lavery, about becoming a participant in the "alternate work arrangement" program ("AWA") that had been established for the service request management group in the spring of 2001. Ms. Trout testified at her deposition that she told Marcia Lavery "[t]hat I was tired and I was sick and I had migraines and I needed to be able to work from home if possible on the days when I could not make it into the office."[1]

Ms. Trout acknowledged that she was just starting to learn the new job in December; indeed, she testified that she was still learning it in April of 2002, at which time, as we shall see, her job ended. It is undisputed that the AWA ground rules made it a condition for

---

[1]There is a conflict in the evidence as to precisely when Marcia Lavery was told about migraine headaches being the reason Ms. Trout wanted to enter the AWA program. Ms. Trout testified that she told Marcia Lavery this in mid-December. Ms. Lavery testified that there was no mention of migraines when Ms. Trout initially raised the AWA issue; according to Lavery it was not until January of 2002 that Trout told her she would like to work at home on days when she had a migraine. For present purposes we accept Ms. Trout's version.

participation in the program that the applicant have a demonstrated track record of satisfactory performance on the job.

It is clear that Ms. Trout had not been on the job long enough to establish the requisite track record as an RO. Marcia Lavery has attested — without contradiction — that "[n]o Request Owner had ever been permitted to go on AWA until they had shown a track record of knowledgeable and proficient performance, or until they had been performing in the RO role for about a year." Ms. Lavery testified that she told Ms. Trout that working as an RO from home "would be something we could look at in the future, but not right now."

Rather than authorize Ms. Trout to work unsupervised at home, Marcia Lavery "permitted her to call off work on occasions when she was unable to drive to work." Ms. Trout called off twice in the first two months of 2002. Her pay was not docked for these absences.

Ms. Trout was apparently given to understand early in 2002 that her request for enrollment in the AWA program would be treated instead as a request for accommodation under the Americans with Disabilities Act. An EDS "human resources specialist" named Dolores Bertossi told Marcia Lavery that the ADA might be involved and that she (Bertossi) would check with the employee relations department about this. (Employee Relations, Ms. Bertossi explained, was the group that handled ADA accommodations.) Ms. Bertossi did check, at some point, and was told "yes, she [Ms. Trout] could request a doctor's note."

Unfortunately, Ms. Bertossi let the matter slip through a crack in the press of other business; it was a month or two, she admitted, before she got back to Marcia Lavery.

Meanwhile, Ms. Trout's days as an RO were drawing to a close. All of the supervisors in the service management group, including Marcia Lavery, were told that they had to reduce the headcount on their teams, and each supervisor was directed to give her manager a list of candidates to be cut from the work force. Some ROs were cut because of complaints about their performance, but this was not Ms. Trout's problem; her name was put on Marcia Lavery's list, according to evidence that stands unrefuted, because Ms. Trout was still being trained and lacked the experience and knowledge of those ROs who survived the cut. Ms. Trout was the least experienced RO on Ms. Lavery's team.

Some of the more experienced ROs who lost their jobs in the cutback were unable to continue working for EDS in any capacity. Ms. Trout, however, was offered a job as an EDS "HelpDesk Coordinator" in Lansing, Michigan. Her former supervisor, Monica Ritter, had seen Ms. Trout's name on a layoff list and selected her for a job that was open in a unit Ms. Ritter now managed. The pay and benefits were the same, and the new job carried a higher classification than the old one. Ms. Trout accepted the offer and transferred to Lansing on April 8, 2002.

Lansing is 55 miles from Ms. Trout's house in Flint, and the new job entailed a commute of at least an hour each way. Although Ms. Trout had been driving for years, the

length of the commute proved problematic; as she explained at her deposition, she did not feel alert enough to make the trip safely.

The cost of the commute was also a concern, apparently. On her first day in Lansing, Ms. Trout asked Monica Ritter if she could get gas money. She also asked if there were "any chance of turning this into an AWA position" so she could work from home. The answer to both questions was negative. Monica Ritter was very encouraging, however, about the prospects for Ms. Trout's moving up to a management position at some point.

On April 3, 2002, shortly before she started at Lansing, Ms. Trout had two small skin lesions removed. The procedure was performed by a doctor of osteopathy named Chris Bakris, who maintained a general family practice. The record does not disclose when it was that Dr. Bakris became Ms. Trout's family doctor.

At the time of the April 3 visit, Ms. Trout complained to Dr. Bakris of chronic fatigue and migratory joint pain. The doctor arranged for some lab work and told her to return in 10 days.

Ms. Trout next saw Dr. Bakris on April 29, 2002. His typewritten office notes show that the results of the lab work were within normal limits, but that Ms. Trout was having muscle and tendon pain, accompanied by pain in the wrists with tingling in her fingers, and she "was having problems with her depression." The doctor diagnosed fibromyalgia, depressive disorder, and bilateral carpal tunnel syndrome.

An April 29 medication list indicates that Ms. Trout was taking Celebrex, apparently for arthritis pain. She was also receiving Imatrex shots for her headaches, Tegretol to control her seizures, and several other drugs, including Paxil, an antidepressant.

Ms. Trout subsequently testified that she felt under stress at this time because of the pain in her limbs, her commuting situation, and worry over her son, who had been diagnosed with a growth at the base of his brain. (The doctor's April 29 notes state, somewhat cryptically, "Patient is having . . . emotional problems with her son.")

The April 29 notes show that Dr. Bakris recommended bilateral EMGs in connection with the wrist and arm pain,[2] "self referral to a psychiatrist," and 30 days of sick leave. Ms. Trout promptly called in sick and filed a timely application for short-term disability benefits.

The EDS short-term disability program, which was administered for the company by the Metropolitan Life Insurance Company, or "Met Life," was designed to provide income protection for EDS employees who were unable to work, "even on a modified level," due to an illness or injury for which they were under treatment. The handbook describing the program told the employee that "[y]our inability to work must be a direct result of your illness . . . ." The handbook went on to say that "[t]o receive STD benefits, you must be receiving appropriate care and treatment for your specific condition and your medical provider must provide documentation . . . that validates your medical inability to work . . . ."

---

[2]A review of Ms. Trout's EMG reports on May 15, 2002, disclosed no nerve entrapment or neuropathy.

Dr. Bakris saw Ms. Trout on May 15, 2002, at which time he filled out a form certifying that she had a "serious health condition" consisting of fibromyalgia, chronic tendinitis, depressive disorder, and migraine headaches. Although the doctor answered "yes" to a question as to whether the employee was unable to perform work of any kind, he noted that "she would be able to perform essential functions of her employment from Home."

The typewritten office record of the May 15 visit expands on this as follows: "Note was given for her employer that in view of the fact that she only has the use of one eye and treated for depression as well as migraine headaches and seizure disorder I do not feel she should be driving to Lansing for her employment."

A note dictated by Dr. Bakris on May 29 says that Ms. Trout was "seeing a therapist . . . ." Met Life was never given any information, however, about who this therapist was or what he was doing for Ms. Trout. The May 29 note says that Ms. Trout was not able to work and that the doctor was extending her sick leave to July 1. (On subsequent visits this date was extended further, first to July 9 and then to July 26.)

At the time of an office visit of June 11, 2002, Dr. Bakris recorded that he "[r]ecommend[ed] therapist referral . . . ." He added that "she can self refer with her insurance." Dr. Bakris reviewed Ms. Trout's medications on the June 11 visit "and rewrote medications to be sent out to be filled." (Given that a psychiatrist was later to take Ms. Trout off Paxil, it is fair to infer that Dr. Bakris renewed her prescription for Paxil. Whether it was Dr. Bakris who prescribed the drug initially we do not know.)

Dr. Bakris recorded his impression of what was wrong with Ms. Trout as follows: "Persistent fibromyalgia [] pain. Migraines. Depressive disorder." The typewritten June 11 note repeats that she was "[n]ot able to work at this time." Whether the doctor's reason for this conclusion had changed since May 15 is not clear.

By letter dated June 20, 2002, Met Life told Ms. Trout it was denying her disability benefits claim for lack of appropriate medical documentation. After noting that Dr. Bakris (with whom Met Life spoke by telephone on May 30) did not think she should be driving to Lansing, the letter explained that "you must be disabled from performing the essential functions of your job . . . ." Such a disability had not been demonstrated, the letter said: "Dr. Bakris has not presented office notes, objective findings, test results, restrictions, limitations, treatment plan . . . that support your medical inability to perform the functions of your job." On the contrary, Dr. Bakris "indicated that you would be able to perform the essential functions of your employment from home." The letter also made the point that Ms. Trout's job as a help desk agent did not require her to drive.

Ms. Trout was told that she could request Met Life to review the denial of her claim and could submit additional medical information. She did request a review, and she submitted additional information that included, according to Met Life, her medical records from Dr. Bakris for the period of April 29 through July 8. She also submitted, for the first time, records from a mental health institution called Oakland Psychological Clinic. These records extended from June 19 through July 22, 2002.

Among the clinic's records was a "comprehensive assessment form" filled out by therapist Steven Brooks — described in Ms. Trout's deposition as a psychologist — who saw Ms. Trout for the first time on June 19. Mr. Brooks' handwritten entries on a section of the form captioned "Diagnostic Summary" begin with the words "Major Depression." A "Treatment Plan" outlined in the form envisioned 20 weekly visits intended to improve Ms. Trout's "life outlook" and "coping skills."

Ms. Trout also started seeing a psychiatrist affiliated with the clinic, Gerald G. Pope. Dr. Pope prepared an "attending physician statement" dated July 22, 2002, in which he apparently indicated that he had "advised [Ms. Trout] to cease working." Although Dr. Pope's July 22 statement was furnished to Met Life, we have been unable to locate a copy in the record.

In a deposition given in July of 2003 Ms. Trout testified to having gone through "an emotional breakdown" characterized by uncontrollable crying, among other things. (Dr. Pope's progress notes of August 29, 2002, to which we shall refer again, evidently referred to "weepiness and tearfulness that was uncontrollable at times. . . .") Ms. Trout was depressed for months, she testified, and there were days and weeks when she could do nothing for herself or her children. She said that her daughter did cooking and cleaning for her, as did her sister, while her father helped with the lawn and her ex-husband kept up the pool and paid bills. A note dictated by Dr. Bakris on July 8, 2002, spoke of Ms. Trout's "persistent fatigue and depression" and a "[f]lat affect [that was] apparent on observation."

"[W]hen you're really, really depressed," Ms. Trout testified, "you don't do things . . . you just don't get up, you don't — you don't take care of yourself. You don't take care of anything." Although she considered relocating to Lansing, Ms. Trout said in response to one deposition question, "I was just too sick to think about it."

By letter dated August 7, 2002, Met Life rejected Ms. Trout's appeal. Her claim had been denied initially, the letter said, because "[i]nformation was received indicating that the restrictions and limitations reported by Dr. Bakris would not prevent you from performing the essential functions of your job . . . ." The letter went on to say that Met Life had arranged for an independent consultant to evaluate the file and speak with Dr. Bakris. That conversation disclosed, according to the letter, that Dr. Bakris now felt that Ms. Trout was unable to perform the functions of her job "irrespective of driving." The letter noted that Dr. Bakris did not feel that it was her "medical conditions" that rendered her unable to work, but her "depression and anxiety."

Met Life told Ms. Trout that it found nothing in her file to provide any basis for Dr. Bakris' current conclusion that she was "psychologically disabled" or "to support that you were psychologically disabled when you ceased working." The letter noted the plan's requirement that an applicant for benefits "must be receiving appropriate care and treatment from a medical provider for [her] specific condition," and stated that "[t]reatment with Dr. Bakris, a Family Practice physician, is not appropriate for a severe, disabling psychological and/or psychiatric condition."

The letter acknowledged that Dr. Pope, a psychiatrist, had "suggested you cease working," but this suggestion was dismissed on the ground that "you were not seen by that office until June 19, 2002." Accordingly, the letter concluded, "your file contains no objective evidence that any condition, physical or psychological, rendered you unable to perform the duties of your occupation for any employer when you ceased working" — *i.e.* on April 29.

On August 19, 2002, following Met Life's denial of her appeal, Ms. Trout returned to work at Lansing. She testified that she was able to arrange a ride with a co-worker, and was able to perform the job "fairly well." EDS allowed her to work only through August 26, however, because she did not have a note from her doctor authorizing her to return to work.

Ms. Trout saw Dr. Pope again on August 29, and a progress note he prepared on that date was subsequently described by a Met Life psychiatric consultant as "appear[ing] to support medical psychiatric impairments that preclude a return to work . . . ." (This progress note, like Dr. Pope's statement of July 22, is conspicuous by its absence from the record.) Ms. Trout promptly submitted a new claim for short-term disability benefits, and the claim was received by Met Life on September 5, 2002. Dr. Pope saw Ms. Trout again on September 9, at which time he reportedly noted that she "has seemed improved and less worrisome."

In a "Mental/Behavioral Functional Assessment" questionnaire completed by Dr. Pope at Met Life's request on September 23, the psychiatrist gave this description of his findings: "She seems anxious — displays labile effect and mood-voiced depression. Re physical

condition — the impact of Sturge-Weber syndrome in her physical-mental health exhibits numerous [illegible] complaints." Dr. Pope then responded as follows to a question about functional impairments that were prohibiting Ms. Trout from returning to her job: "The conjunction with physical condition and symptoms, effective lability and mood depression have been compromising her ability to perform work related activities." A question as to "current treatment plans and goals" evoked this answer: "(1) Neurological status is under review — EEG and MRIs are to be performed in near future, (2) reversal of depression process and somatization pathology is the main treatment goal." The questionnaire went on to indicate that Ms. Trout was being medicated with Tegretol and Pamelor. Asked for his estimate of a return-to-work date, Dr. Pope wrote that "as soon as evaluation is completed she may be authorized work on a part-time basis initially and then she may resume full-time employment. Probable return to work date in six weeks from this date."

In a telephone conference with the Met Life consultant on September 29, Dr. Pope reportedly indicated that Ms. Trout had no impairments in her daily functioning outside the work setting. Her memory was said to be intact, she looked better, and she was more alert.

By letter dated September 30, Met Life told Ms. Trout that her application for benefits had been approved for the period from August 27 through September 8, but not thereafter. Although the letter referred to Dr. Pope's September 9 progress note, that note too has been omitted from the record.

Ms. Trout's lawyer evidently sent a copy of Met Life's September 30 letter to the Oakland Psychological Clinic. Under date of October 14 the clinic's Steven Brooks wrote the lawyer a letter taking sharp issue with Met Life's disposition of the claim. The central paragraph of Mr. Brooks' letter reads as follows:

> "Ms. Trout is unable to work and has been off work from the date of her first visit, which was June 19, 2002. Dr. Pope completed an evaluation on September 23, 2002, and found her unable to work for at least six more weeks. Just because she appeared to look better and more alert, does not justify her being off short-term disability. We often look for positive progress and attempt to document it. The fact remains that she has not recovered sufficiently enough to date to return to work."

Finally, in a letter to Met Life dated November 18, 2002, Dr. Pope reported that he had authorized Ms. Trout to return to work on November 4. The letter went on to say this:

> "I saw her again in my office today and the issue of her seizure disorder for which she has been treated for years emerged as interfering with her ability to drive, including driving to and from work. It is our position that her sick leave should extended until the matter of the diagnosis of epilepsy and her ability to drive is resolved by her attending neurologist. She is fit to return to work from a psychiatric viewpoint."

Ms. Trout filed her lawsuit in February of 2003, by which time she was actively seeking a new job at EDS. The job search proved successful, and she was returned to the EDS payroll as of March 31, 2003. In her new job she arranged roadside assistance for motorists who called in for help.

EDS filed a summary judgment motion, accompanied by numerous exhibits, in September of 2003. Ms. Trout filed an opposing brief accompanied by additional exhibits, EDS filed a reply brief with attachments, and the district court then heard oral argument. A

few weeks later the court issued its opinion and order granting EDS summary judgment. Ms. Trout's appeal followed.

## II

In the amended complaint on which summary judgment was granted, Ms. Trout asserted that EDS violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws §§ 37.1101 *et seq.*, by denying her request for accommodation and by transferring her to a position that exacerbated her alleged disability. The amended complaint further asserted that the denial of Ms. Trout's applications for short-term disability benefits constituted a breach of contract.

Turning to the statutory claims first, we note that Michigan's statute is substantially identical to the ADA. Michigan courts therefore rely on ADA decisions in resolving claims under the state law, see *Smith v. Chrysler Corp.*, 155 F.3d 799, 804 (6th Cir. 1998), and Ms. Trout has not asserted that her rights under the state act are more extensive than her rights under the federal act.

The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual . . . ." 42 U.S.C. § 12112(a). For ADA purposes, "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability . . . ." *Id*. § 12112(b)(5)(A).

To prevail on her reasonable accommodation claim, Ms. Trout must prove (1) that she had a disability, (2) that she was otherwise qualified for the job in question, and (3) that EDS refused to make a reasonable accommodation of her known physical or mental limitations. See *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).

With respect to the period when Ms. Trout was working as an RO in Flint, the district court concluded that the evidence submitted by Ms. Trout, taken in the light most favorable to her, failed as a matter of law to establish that she was suffering from a "disability" — a term defined in the statute as a "physical or mental impairment that substantially limits one or more . . . major life activities . . . ." 42 U.S.C. § 12102(2)(A). For substantially the reasons given by the district court in its opinion, we agree with this conclusion.

Even if Ms. Trout had been able to show that she was disabled prior to her transfer to Lansing, moreover, the failure-to-accommodate claim would still have failed as a matter of law — for Ms. Trout was unable to show that EDS failed to make reasonable accommodations to her known limitations. It is undisputed that EDS accommodated such limitations by allowing Ms. Trout simply to call off work, without penalty, when she felt unable to come in. It is true that she was not allowed to work from home under the AWA program, but she was entitled only to a reasonable and effective accommodation, not necessarily to the accommodation of her choosing. See *Hankins v. The Gap Inc.*, 84 F.3d 797, 800-01 (6th Cir. 1996). "[A]n employee cannot make his employer provide a specific accommodation if

another reasonable accommodation is instead provided." *Id.*, citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68-69 (1986).

With respect to the period following Ms. Trout's transfer to Lansing as a help desk coordinator, it is undisputed that the AWA program was not available to such coordinators. Ms. Trout has made no attempt to show that it would nonetheless have been reasonable for EDS to let her perform the coordinator job from home. The failure-to-accommodate claim would necessarily fail for that reason even if Ms. Trout had been able to show that she was disabled. And although a trier of fact could have found that she became disabled after her transfer to Lansing, Ms. Trout could not show that she was disabled on her first day at the new job, which is the day when she asked her Lansing supervisor about working from home. As the district court correctly observed, "[t]he Sixth Circuit has instructed that in order to recover under the ADA, a plaintiff must establish as part of the prima facie case that she was a qualified individual with a disability *at the time of the discriminatory act*." Slip Op. at 7, quoting *Kocsis v. Multi-Care Management Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) (internal quotation marks omitted).

It follows from what we have already said that Ms. Trout could not successfully claim that the transfer constituted an act of prohibited "discrimination" irrespective of the alleged failure to accommodate. Ms. Trout does not claim to have presented direct evidence that EDS transferred her for unlawful reasons. She therefore had to establish a prima facie case with indirect evidence under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973). To make out this kind of prima facie case, Ms. Trout had to show (1) that she was disabled, (2) that she was otherwise qualified for the RO position with or without reasonable accommodation, (3) that the transfer constituted an adverse employment action, (4) that EDS knew or had reason to know of her disability, and (5) that she was replaced or that her former job remained open while EDS sought other applicants. See *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). Ms. Trout can show that she was qualified, but that is about all she can show.

The evidence, as we have seen, would not warrant a factfinder's concluding either that Ms. Trout was disabled at the time of her transfer to Lansing or that EDS knew or should have known she was disabled. This gap in her case might not have precluded her from recovering on a theory that the transfer was made in retaliation for requesting an accommodation, but to prevail on that theory in the absence of direct evidence — and there is none here — Ms. Trout would still have to show that she was subjected to an adverse employment action. This she failed to do. As the district court correctly concluded, Ms. Trout's transfer to a job with the same salary and benefits was not an adverse action. Ms. Trout has not shown that the transfer constituted a "demotion evidenced by a less distinguished title" or "significantly diminished material responsibilities." See *White v. Burlington Northern & Sante Fe Railway Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc), *petition for cert. filed*, No. 05-259 (Aug. 24, 2005). Her chief complaint is that the new position required a longer commute — but we are not

prepared to say that a commute of approximately one hour each way could render an otherwise unexceptionable job transfer "adverse."

Ms. Trout has not shown, moreover, that she was replaced in the RO position or that her former job remained open while EDS sought other applicants. Although some of the RO employees who survived the cut at Flint were moved from other teams to Marcia Lavery's team, the redistribution of work among existing employees in the Flint service request management group does not mean that there was no bona fide reduction in force ("RIF"). No one was brought into the group from elsewhere in the EDS organization, and no new employee was hired for an RO position. The RIF was real.

Even if Ms. Trout could present the requisite indirect evidence to establish a prima facie case that the transfer constituted "discrimination" or retaliation, EDS could rebut such a prima facie case by offering a legitimate explanation for its actions. Ms. Trout would then have the burden of presenting evidence to show that the explanation was a pretext for unlawful conduct. See *Monette*, 90 F.3d at 1186. EDS did in fact offer a legitimate explanation for the transfer — *i.e.*, that it was occasioned by a RIF — and Ms. Trout made no showing that the RIF was a pretext for getting rid of her. It is not without significance, in this connection, that ROs with more experience than she lost their jobs in the RIF without being offered the opportunity to transfer elsewhere within the company.

In short, we are satisfied that Ms. Trout's statutory claims have no merit. The district court, in our view, acted correctly in disposing of them by summary judgment.

III

Ms. Trout's claim for wrongful denial of her application for short-term disability benefits presents a closer — and more interesting — question.

EDS and the district court seem to have believed that because Ms. Trout failed to document an inability to work as of April 29, 2002 (the first day for which she claimed short-term disability benefits), it is immaterial whether she could document a subsequent disability. The premise is correct, we believe, but the conclusion is not.

Under the EDS short-term disability program, as we have seen, an applicant for benefits (1) must be unable to work as a result of illness or injury, (2) must be receiving appropriate care and treatment for that specific illness or injury, and (3) must arrange for her "medical provider" to furnish documentation "validat[ing]" her " medical inability to work." As to the period from April 29, 2002, to June 19, 2002, Ms. Trout failed at the very least to satisfy requirement (3).

The documentation furnished by Dr. Bakris showed that the doctor thought Ms. Trout was unable to work, but it also showed that the reason he thought so was not that she was unable to work from a medical standpoint. The reason, rather, was that she was unable to drive the 110 miles that had to be covered in getting from her home to her work station and back. These are two very different concepts — and where driving is not an essential function of the job, an inability to drive does not in itself bespeak an inability to do the job.

Any inference that Dr. Bakris was telling EDS that Ms. Trout's condition rendered her unable to work was expressly negated by the doctor's affirmative statement that Ms. Trout "would be able to perform [the] essential functions of her employment from Home." A jury could not be permitted to find that the documentation from Dr. Bakris validated a medical inability to work when the documentation in fact validated the conclusion that Ms. Trout's medical condition did *not* foreclose her ability to work as long as she did not have to drive.

It may be true, as Ms. Trout argues, that Dr. Bakris treated her for depression, among other things, and it may be true that there came a time when her depression rendered her unable to work at all. But the documentation furnished by Dr. Bakris did not advise EDS that Ms. Trout was unable to work because of her depression — and that omission doomed Ms. Trout's disability benefits claim for the period as to which she relied solely on documentation from Dr. Bakris.

The picture changed, of course, after June 19, when Ms. Trout began treatment with the Oakland Psychological Clinic. The documentation provided by the clinic indicated that Ms. Trout was suffering from "Major Depression." EDS itself seemed to read the clinic's documentation as suggesting that her depression was disabling. We see no reason why a jury could not be permitted to find that Ms. Trout met all of the requirements of the short-term disability program from June 19 until she went back to work at Lansing on August 19. Nothing in the handbook describing the short-term disability program suggests to us that a failure properly to document a disability from day one would preclude the recovery of benefits

from day two or day three if a medical condition were to become disabling then and were to be documented in accordance with the requirements of the program. Nothing in the handbook suggests a need for refiling a formal claim under these circumstances — although there came a time when Ms. Trout did, in fact, refile.

Moving further along the time scale, Ms. Trout obviously was not disabled between August 19 and August 26, when she was not only working, but, by her own admission, was working "fairly well." It was not depression or migraines that stopped Ms. Trout from continuing to work, but the instruction from EDS not to come in without a doctor's certificate. (It may seem anomalous that Ms. Trout should have been denied disability benefits for want of a doctor's statement that she could not work, only to be denied employment for want of a doctor's statement that she could.) Nevertheless, there is no dispute with respect to the period from August 29 to September 9, 2002; EDS voluntarily elected to pay disability benefits for that period.

The district court has not yet had occasion to focus specifically on the time from September 9 to November 4, 2002 — the latter date being the one as of which Dr. Pope opined that Ms. Trout was "fit to return to work from a psychiatric viewpoint." If the parties cannot now resolve the September-November question on their own, we are content to let it be resolved initially in the district court.

Finally, we note that the publication setting forth the EDS short-term disability policy concludes with a boilerplate "Disclaimer" reading as follows:

"This publication is only intended as a guideline. None of the information contained herein is intended to give special rights or privileges to specific individuals or to entitle any person to remain employed by EDS. Unless contrary to applicable law or the terms of a written contract executed by an officer of EDS, employment at EDS is not guaranteed for any definite period and may be terminated at any time by the company or by an employee with or without cause or previous notice. Although some of the guidelines are set forth herein may suggest, even strongly, that certain procedures or steps be followed, these procedures should not be interpreted as altering an individual's employment relationship and do not constitute an employment contract."

At oral argument, counsel for EDS contended that this disclaimer should be dispositive of Ms. Trout's breach of contract claim. Not foreshadowed earlier in the appellate proceedings except for a three-line footnote at page 40 of the EDS brief, the contention may well have been waived. See *Buziashvili v. Inman*, 106 F.3d 709, 719 (6th Cir. 1997). The contention is not persuasive in any event. We have no doubt that Ms. Trout was an employee at will, and we assume that EDS would have been free to amend its short-term disability program prospectively or terminate it altogether. EDS could not keep the program in force for everyone else, however, and claim to have amended or abolished it retroactively as to Ms. Trout alone.

The judgment entered by the district court is **AFFIRMED** in part and **REVERSED** in part, and the case is **REMANDED** for further proceedings not inconsistent with this opinion.